UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RUDOLPH YOUNG,

                            Petitioner,

      -vs-

JAMES CONWAY,

                         Respondent.

**DECISION AND ORDER**
**No. 07-CV-6047(VEB)**

_____

## I.      Introduction

*Pro se* petitioner Rudolph Young ("Young" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his conviction, following a jury trial, on two counts of first degree robbery and one count of first degree burglary.

The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.      Factual Background and Procedural History

### A.      The First Trial

The incident giving rise to Young's convictions was the home-invasion robbery of William Sykes ("Mr. Sykes") and Lisa Sykes ("Mrs. Sykes") on the night of March 29, 1991, in the Town of Brighton, just outside the City of Rochester. That night, an intruder entered the Sykes home, wearing a blanket wrapped around his body as well as a scarf covering his entire face except for the eyes and forehead. Brandishing an axe over Mr. Sykes' head, the intruder demanded money, which the Sykes gave to him, along with several watches, a pair of binoculars, and other items of personal property.

-1-

The description given by the victims was an African-American male, in his twenties, with a medium build, and about 5'10"-tall. The victims could not assist in the creation of a composite sketch of the intruder because he was covered with the blanket and the scarf was hiding his face.

About a month after the incident, on April 25, 1991, Mrs. Sykes viewed a photographic array containing Young's picture but did not make an identification. Mr. Sykes also viewed the array but did not identify anyone from it.

Young was arrested on April 27, 1991. That day, a lineup identification procedure was held. Mr. Sykes was unable to identify Young as the perpetrator; he indicated that the person in the #1 position sounded like the intruder and that #6 looked like the intruder. However, Young was #4. Although Mrs. Sykes had been unable to identify Young during the photo array, she did identify Young in the April 27th lineup. She testified at trial in 1993 that she made the line-up identification on the basis of a "combination"of factors–"from seeing him and also the voice."

Following a jury trial, Young was convicted as charged in the indictment and sentenced as a persistent felony offender. On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court, determined that the police lacked probable cause to arrest Young and that the testimony regarding the lineup identification by Mrs. Sykes was improper: "Because the police obtained defendant's consent to the lineup by means affected by the primary taint, it must be concluded that the lineup identification flowed directly from the illegal arrest and was not attenuated therefrom[.]" *People v. Young*, 255 A.D.2d 905, 906 (App. Div. 4th Dept. 1998). The Fourth Department went on to hold that "[b]ecause proof of the line-up identification and other evidence obtained by police at the time of the arrest contributed to defendant's conviction," the conviction should be reversed and the motion to suppress the line-up

identification granted. In remanding the case for a retrial, the Fourth Department indicated that the prosecution should be given the opportunity "to demonstrate that the ability of the victim to make an in-court identification stemmed from her observation of defendant at the time of the crime and therefore ha[d] a basis independent of the unlawful arrest and tainted identification procedure."*Id.*

## B.    The Remand

### 1.    The Independent Source Hearing

At the subsequent state court proceeding entitled an "Independent Source Hearing," defense counsel objected that, as a matter of law, there could be no "independent source" for Mrs. Sykes' identification, given the eight-year passage of time and the considerable news coverage of the incident and first trial. The new trial court (Ark, J.) disagreed, noting that the Appellate Division had directed such a hearing be held.

Mrs. Sykes was the only witness called at the independent source hearing. She described in some detail the actual incident and testified as to why she remembered the intruder from her observations of him during the crime, and not from the suppressed line-up procedure. Mrs. Sykes testified that when she first saw the intruder, he was standing "a couple of feet" away from her in the area of her dining room which was well lit. ISH.25-27 (Citations to "ISH.__" refer to pages from the transcript of the Independent Source Hearing). The intruder was wearing a blanket with a slit cut in it over his body and had a scarf draped around his face, covering up to his nose. Mrs. Sykes testified that the burglar was only a couple of inches taller than her, so she was able to look at him face-to-face. *Id.*

After initially screaming, Mrs. Sykes looked carefully at the intruder; she was in disbelief

thinking that it was some kind of prank, that the incident could not be random. ISH.27-28. Mrs. Sykes stared at the intruder's eyes and realized that she did not know the person. ISH.27. At that point, the burglar walked directly behind Mr. Sykes and held the axe over his head. The burglar looked directly at Mrs. Sykes and stated, "I will kill him. Give me your wallets." *Id.* Still not believing that the break-in could be random, Mrs. Sykes "kept staring" at the intruder, trying to determine if it was someone she knew. ISH.28.

Mrs. Sykes again came face-to-face with the burglar when the three of them were walking down the hallway to the master bedroom to retrieve Mr. Sykes' wallet. Mrs. Sykes turned on the hall light and the intruder turned and looked right at her. Mrs. Sykes continued to watch the intruder as he relieved Mr. Sykes of his money and watches. ISH.28-29.

Next, the intruder demanded Mrs. Sykes give him her money, and he proceeded to rip two telephones out of the walls. During this time, Mrs. Sykes kept looking at the burglar "trying to figure out who this person was." ISH.30-32. The man then told her, "Don't look at my face." At that point, Mrs. Sykes averted her eyes; however, up until then, she had continuously looked at his face trying to determine who he was. ISH.32. The burglar left the house shortly after that.

Mrs. Sykes estimated that the intruder had been in her sight for about five to seven minute. Mrs. Sykes explained that she "really stared" at the burglar's eyes while he was inside the house. She did not believe she could assist with a composite sketch because she had not seen his whole face.

Mrs. Sykes testified that she woke up during many nights after the crime seeing the intruder's eyes in her nightmares. ISH.35.

With regard to her inability to made a positive identification from the photo array, Mrs.

Sykes testified that the pictures in the array did not "look real" to her. ISH.64.

Mrs. Sykes insisted that she could identify Petitioner based solely on the appearance of his eyes. ISH.78. When questioned, she assured the trial court that her recollection of Petitioner's eyes was from her observations on the night of the crime and was not based upon her viewing him during the line-up procedure. ISH.85-86. Based on the results of this hearing, Petitioner was retried on the home-invasion robbery charges.

### 2. The Second Trial

What follows is a summary of the prosecution's proof presented at Young's re-trial on the Sykes home-invasion.

At about 10 p.m. on March 29, 1991, Mr. and Mrs. Sykes were in their living room watching television when their dog began barking, leading them to notice that the door in the kitchen that led to the attached garage was ajar. Mr. Sykes, who was wheelchair-bound as the result of a disability, went into the kitchen, shut the door, and engaged the deadbolt lock. *See* T.31-34, 91-93 (Citations to "T.__" refer to pages in transcript of the re-trial). The couple continued to watch television.

About twenty minutes later, they heard loud noises coming from the kitchen area. Mrs. Sykes began to walk toward the kitchen to investigate. As she neared the dining room, Mrs. Sykes encountered an intruder carrying an ax and a sledgehammer. The man was wearing a blanket with a hole cut into it over his body, and he had a scarf covering his face up to the tip of his nose. T.34-36, 93-94. Mrs. Sykes recognized the blanket as one that had been in her car which was parked in the driveway; she also realized that the ax and sledgehammer had come from their garage. T.36-37.

The intruder yelled at Mr. and Mrs. Sykes to give him their money. *Id.* Mrs. Sykes testified that she was in "total disbelief" that a robber had entered their home. She stated that she concentrated on observing the intruder's partially covered face, thinking that perhaps it was someone she knew playing a bad joke on her and her husband. T.43. As events progressed, however, it became clear that this was not some kind of prank.

The robber walked behind Mr. Sykes, placed the axe above Mr. Sykes' head, and threatened, "I'll kill him!" Mrs. Sykes responded, "I believe you," and grabbed the dog in an attempt to keep her quiet. Mrs. Sykes testified that she was standing but three to four feet away from the intruder as he brandished the axe over her husband's head. Mrs. Sykes explained that the area in which they were all located was well lit, and that the intruder was looking directly at hear as he menaced Mr. Sykes. T.33, 37.

Mr. Sykes informed the intruder that his money was in his wallet, located in the master bedroom. The three proceeded down the hallway; Mr. Sykes went first, followed by the intruder, and then Mrs. Sykes, who turned on a light in the darkened hallway. The intruder turned around and stared at her from about a foot away. Mrs. Sykes testified that the intruder was only a couple inches taller than her so that when he turned and stared at her, she was looking directly into his eyes. T.37-38, 96-97.

Once they were in the master bedroom, Mr. Sykes and the intruder went into the room, while Mrs. Sykes remained in the hallway with the dog. Mr. Sykes gave the intruder the cash in his wallet, approximately $160. However, he convinced the intruder not to take the entire wallet. T.39-40, 98-99. After taking a backpack and three watches from Mr. Sykes' dresser, the robber told Mrs. Sykes, "I want your money, too." Mrs. Sykes retrieved her purse which was on a chair

in the hallway, and gave the intruder her cash. T.40-41.

The intruder then asked where the telephones were located; they told him that one was in the master bedroom. The robber went back down the hallway and ripped that telephone of the wall. He returned and asked where the other phones were located. Mrs. Sykes testified that she was looking at the intruder's face again, because she still could not believe that this man was inside their house; she was trying to recognize him or determine if she knew him somehow. At that point, the robber said, "Don't look at my face," and Mrs. Sykes looked away. T.42-43. The robber then ripped the kitchen telephone out of the wall and left through the same door he had used to gain access to the house. T.44, 104-05.

Mr. Sykes looked out a window in the kitchen to see if the intruder had left the area. Unable to see him, Mr. Sykes went to a telephone about which they had not informed the intruder and called the police. T.44-45, 105-06.

Mrs. Sykes described the intruder to the police as a "[a] man, light black in color, around five-ten, medium build, and later twenties." Because a portion of the intruder's face had been covered up with a scarf, Mrs. Sykes told the police that she did not feel she could help them create a composite sketch. Mrs. Sykes testified that she believed that in order to assist with a composite sketch, she would have had to have seen the robber's whole face. T.48.

Mrs. Sykes testified that she was in close proximity to the intruder for the entire time he was insider their home, which she estimated to be five to seven minutes. Mrs. Sykes related that during the incident, she focused intently on the intruder's eyes. Mrs. Sykes made an in-court identification of Young as the person who had broken into their home and robbed them. T.46-47.

On cross-examination, Mrs. Sykes admitted that she was unable to identify anyone in a

photographic array shown to her just over a month after the crime. T.68-69. (Petitioner was depicted in picture #5 in that array. T.292). Mrs. Sykes testified that the pictures in the photo array did not "seem real" to her and she therefore was not confident in making an identification when she viewed the photo array. T.89.

Mr. Sykes was unable to identify Young as the perpetrator.

The prosecution introduced testimony from Taunja Isaac ("Isaac"), an acquaintance of Young's. Isaac testified that at around the time the Sykes' house was burglarized, she purchased three watches and a pair of binoculars from Young. Isaac described the watches as a Bulova-brand sport watch with a plastic band and waterproof face, a gold watch which was engraved, and a silver watch. The binoculars bore a name tag that read "Sykes". T.130-33. The three watches and the binoculars matched the description of the items stolen from the Sykes' home on March 29, 1991. T.99-100, 111.

About a month after the robbery, a sheriff's investigator met with Isaac hoping to recover some of the property stolen from the Sykes' house. At Investigator Crough's request, Isaac, having previously disposed of the property, attempted to retrieve the watches and binoculars; Isaac was partially successful, recovering the binoculars which she provided to Investigator Crough the next day. T.134, 233-34. At trial, Isaac identified the binoculars introduced into evidence as those she turned over to Investigator Crough. Mr. Sykes identified the binoculars as those stolen from his car. T.112, 136. Although Isaac was cross-examined at length regarding her prior criminal record, she had no charges pending at the time of trial and there was no evidence that she was promised any favors or beneficial treatment in exchange for her testimony. T.173-214.

Another associate of Young's, Nell Kimbrel ("Kimbrel"), provided corroborating evidence tying Young to the Sykes home-invasion. The police executed a search warrant at Kimbrel's apartment since Young had been staying at there at least once a week and leaving some of his belongings there during the months of March and April, 1991. Kimbrel, aware that the police were coming, had gathered all of the items that were not hers and threw them into the garbage. Included in the items Kimbrel had discard just before the police arrived were the workout gloves stolen from Mrs. Sykes. T.253-58, 49. Kimbrel stated that she never actually saw Young with the gloves. T.261.

In an attempt to discredit Mrs. Sykes' description of the intruder as being 5'10"-tall and being in his late twenties, the defense called Investigator Schrader, a retired officer from the Brighton Police Department. Investigator Schrader testified that Young had told him that his birthday was August 2, 1957, which would mean that Young was 34 years-old at the time of the incident. Also, Investigator Schrader testified that Young was 6'0"- to 6'1"-tall. T.302.

Young's trial counsel sought to admit the expert testimony of social psychologist Dr. John Brigham. Prior to ruling on the admissibility of Dr. Brigham's testimony, the trial court allowed the defense to make an offer of proof outside the jury's presence. Dr. Brigham testified at length on two issues in particular–the ability of a person to make an identification independent of a tainted, previous identification; and the ability of a person to make an identification given various confounding factors, including that the assailant's face was covered, there had been a long passage of time between observation and identification, that the viewing was made under traumatic circumstances, and that the identification was "cross-racial". *See* T.307-25. Dr. Brigham was questioned by the prosecutor as well as the trial judge.

The subjects of Dr. Brigham's studies were drawn from lists of registered voters; these individuals were not actual jurors or crime victims. Some of the data relied upon by Dr. Brigham to support his theories were based upon studies involving primates and rats. T.329, 340, 347. Dr. Brigham conceded that it would have been preferable to have performed the studies on actual crime victims. T.334. Dr. Brigham explained that he could tell the jury what an average person's memory retention and accuracy would be, but admitted that he could not give the jury any tools to determine whether Mrs. Sykes was an "average person."

Following the offer of proof, the trial judge declined to allow the defense to call Dr. Brigham, stating merely as follows: "I am going to exercise my discretion. I am not going to allow as evidence his testimony at the time of trial." T.363. Thereafter the defense rested.

The jury returned a verdict convicting Young as charged in the indictment on two counts of robbery and one count of burglary.

### C.    The C.P.L. § 330.30 Motion to Set Aside the Verdict

Represented by new counsel, Young moved pursuant to C.P.L. § 330.30 to set aside the verdict on the basis that the "[f]ailure to allow Dr. Brigham to testify at trial deprived Defendant of his right to present a defense and was an abuse of discretion that requires reversal of the verdict on appeal as a matter of law." Affirmation of Michael Burger, Esq., ¶18 (citations omitted) (Resp't App. "C" at 210). The defense submitted the affirmation of trial counsel Yolanda Villa, Esq., who stated that at an off-the-record conference in chambers, the trial judge had stated "that if any case called for expert testimony on the subject of eyewitness identification, this was it." Affirmation of Yolanda Villa, Esq., ¶7 (Resp't App. "C" at 212). Neither Petitioner nor a court reporter were present. *Id.* According to Attorney Villa, the trial judge later "asserted

that he had done the defense a favor because now there would be the chance to make good law allowing such evidence to be admitted at future trials." *Id.*, ¶8. The assistant district attorney, however, disputed this; his recollection was that the trial court merely stated that given the history of Young's cases, the present case might reach the New York Court of Appeals which then would be able to address the issue of the admissibility of expert testimony on identification. Affirmation of Andrew Cruikshank, Esq., ¶¶5-6 (Resp't App. "C" at 230).

### D.    Sentencing

The prosecution moved pursuant to New York Penal Law ("P.L.") § 70.10 to have Young adjudicated as a persistent felony offender. The trial judge ordered a hearing to be held at which numerous witnesses testified for the defense and the prosecution. Following the hearing, the trial judge indicated that the following convictions were pertinent: a 1974 conviction from Georgia for burglary; a 1975 conviction from Georgia for second degree murder (by guilty plea in satisfaction of indictment charging first degree murder); and a 1989 conviction from Monroe County for attempted second degree robbery (by guilty plea in satisfaction of indictment charging second degree robbery, fourth degree grand larceny, and criminal possession of a forged instrument). The trial court further stated that it deemed relevant for purposes of recidivist sentencing Petitioner's use of violence and threats of violence; his continuous involvement with the criminal justice system since the age of 14; and his drug and alcohol addiction, and his "unlawful behavior". *See* Second Notice of Hearing and Statement (Resp't App. "C" at 204-05).

After the hearing and the submission of additional briefs from the defense and prosecution, the trial court adjudicated Young as a persistent felony offender and imposed sentences of 15 years to life on each of the three convictions. Sentencing Transcript ("Sent. Tr.")

at 44-45. The sentences for the two robbery first degree convictions (P.L. § 160.15(3)) were set to run consecutively to each other and concurrently with the first degree burglary (P.L. § 140.30(3)) conviction. *Id.* at 44-45, 46. (These sentences were then set to run consecutively to the current sentence Young was serving on a previous conviction.[1]). *See* Sent. Tr. at 46; *see also* Sentence and Commitment (Resp't App. "C" at 233).

### E.     The Direct Appeal

#### 1.     The Appellate Division

Young was represented by appellate counsel Gary Muldoon, Esq., on direct appeal. Before a five-justice panel of the Appellate Division, Fourth Department, a three-justice majority voted to affirm the conviction. The majority first held that the prosecution had proven by clear and convincing evidence that the victim had an independent basis for her in-court identification of Young because the victim testified that, although Young's "face was partially covered, she had a clear view of [his] eyes in well-lit conditions for approximately 5 to 7 minutes and that she studied his face in an effort to determine whether he was someone she knew[.]" *People v. Young*, 20 A.D.3d at 893, 798 N.Y.S.2d at 626 (citation omitted).

Two justices dissented, holding that the prosecution had failed to establish an independent source for Mrs. Sykes' identification. Although the victim testified that she had the

---

[1]     About a month after the home invasion at the Sykes' residence, Young was arrested on April 27, 1991, and charged by a Monroe County Grand Jury in two indictments, Nos. 403/91 and 402/91. Indictment No. 402/91 concerned the Sykes home invasion that gave rise to the convictions here at issue. With regard to Indictment No. 403/91, Young was tried and convicted of six felony counts in May 1993, and sentenced as a persistent felony offender. In March 1994, the Appellate Division found that there was no probable cause and that the sentencing procedure was defective. *People v. Young*, 202 A.D.2d 1024 (App. Div. 4th Dept. 1994). Young was then retried on Indictment No. 403/91 and acquitted of all counts except for one count of fourth degree criminal possession of stolen property. He was sentenced as a persistent felony offender to 25 years to life on this conviction. The sentence and conviction were affirmed on direct appeal. *People v. Young*, 255 A.D.2d 905 (App. Div. 4th Dept. 1998), *aff'd*, 94 N.Y.2d 171 (N.Y. 1999). Young is presently serving this 25-year-to-life term on the fourth degree stolen property conviction.

opportunity to look directly at defendant for a period of several minutes in good lighting, the intruder was wearing a scarf around his face, and thus she could see only his forehead, eyebrows, eyes and that part of his nose above the scarf. *People v. Young*, 20 A.D.3d at 895, 798 N.Y.S.2d at 627 (dissenting opn.). However, the victim testified, there were no distinguishing characteristics with respect to the parts of the intruder's that she could see (i.e., his forehead, eyebrows and eyes). The dissenting justices found it significant that immediately after the crime, the victim was unable to assist the police in constructing a composite of the intruder because she had not seen the full face of the intruder. *Id.* Although the victim further testified that she had nightmares about the intruder during which she would see "those [the intruder's] eyes," she was unable to select Young's picture from a photographic array conducted one month after the crime despite looking into the eyes of each man set forth in the photo array. *Id.*

Later in the day on which the photo array was conducted, the victim identified Young from a lineup, based on both his eyes and his voice. As the dissenting justices noted, that line-up procedure was held to be insufficiently attenuated from what was an arrest without probable cause. *Id.* Although the victim asserted at the independent source hearing that she had a recollection of Young based on her viewing of him in her home on the night of the crime, and she testified that her recollection was independent of her viewing of him in the lineup one month after the crime, the dissenting justices held that the trial court had "erred in determining that the People established by clear and convincing evidence that the victim had an independent basis for her in-court identification of defendant, untainted by the illegal lineup identification procedure." *Id.* The dissenting justices based their conclusion on the "inability of the victim to assist the police in constructing a composite of the intruder and her inability to select defendant from a

photo array prior to the lineup identification procedure" which "strongly suggest[ed] that her alleged independent 'recollection' of defendant was irrevocably tainted by her having viewed defendant in the lineup and having heard him speak." *Id.* The dissenting justices accordingly were compelled to conclude that "any in-court identification testimony by the victim 'would be derived from exploitation of the illegal arrest[.]'" *Id.* (quoting *People v. Underwood*, 239 A.D.2d 366, 367, 658 N.Y.S.2d 629, 630 (App. Div. 2d Dept. 1997); citation omitted).[2] The dissenting justices voted to reverse the judgment and grant Young a new trial at which the victim would be precluded from making an in-court identification.

With regard to the refusal to admit Dr. Brigham's testimony, the Appellate Division unanimously agreed that the trial court "did not abuse its discretion in denying his motion to permit expert testimony on the subject of eyewitness identification. The proposed expert was examined at length during the offer of proof by both counsel and the court and, '[s]ince the motion was considered during the People's case-in-chief, the court was in a position to weigh [the relief sought in the motion] against other relevant factors,' including the victim's identification testimony and the testimony of defendant's acquaintances from whom some of the stolen property was recovered[.]" *People v. Young*, 20 A.D.3d at 894, 798 N.Y.S.2d at 626 (quoting *People v. Lee*, 96 N.Y.2d 157, 160 (N.Y. 2001) (holding that psychological expert's testimony was inadmissible at robbery trial to explain to jury factors that might have influenced victim's perception and memory as they related to reliability of his identification testimony,

---

[2]        *See also People v. Gethers*, 86 N.Y.2d 159, 162 (N.Y. 1995) ("Generally, when the police have acted illegally, evidence which "'has been come at by exploitation of that illegality'" should be suppressed (*Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 There are, however, three commonly advanced exceptions to this general rule-the independent source, inevitable discovery, and attenuation doctrines (*see, United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537).") (some internal citations omitted).

given centrality of identification issue and existence of corroborating evidence in addition to identification testimony).

## 2. The New York Court of Appeals

Leave to appeal to the New York Court of Appeals was granted. That court first considered the argument that the trial court's "independent source" finding, which the Appellate Division affirmed, was incorrect as a matter of law. The New York Court of Appeals summarized Young's argument as follows:

> [C]onsidering Mrs. Sykes's limited view of the robber, and the long lapse of time and the many intervening events–including the photo array and the lineup–between the crime and the independent source hearing, it was impossible [argued Young] to find by the requisite clear and convincing evidence that the lineup would not influence her in-court identification.

*People v. Young*, 7 N.Y.3d 40, 44 (N.Y. 2006) (citing *United States v. Wade*, 388 U.S. 218, 240 (1967); *People v. Ballott*, 20 N.Y.2d 600, 606 (N.Y. 1967)). Noting that this argument "ha[d] force[,]" the Court of Appeals nevertheless determined the issue to be beyond its power to review because the trial court and the Appellate Division majority had rejected the argument and, in doing so, had resolved an issue of fact. *Id.* Because "[t]here [wa]s support in the record for their finding" of an independent source, the New York Court of Appeals could not disturb that finding. *Id.* (citing *People v. Malloy*, 55 N.Y.2d 296, 300 (N.Y. 1982) (""[T]his court cannot say that the finding of an independent basis for an in-court identification by each witness was erroneous as a matter of law. The inquiry necessarily is a factual one, involving an evaluation of the totality of circumstances. As such, the determination that there existed an independent source for the subsequent identifications, left undisturbed by the Appellate Division, is beyond this court's power of review if supported by the record. As can be seen, such support exists.")

(internal citations omitted); *see generally People v. Leonti*, 18 N.Y.2d 384, 389 (N.Y. 1966) ("In an appeal to this court, we have limited jurisdiction to pass on factual determinations affirmed by the Appellate Division.").

With regard to the refusal to allow Dr. Brigham's testimony, the majority stated that the "harder question is whether the trial court abused its discretion in excluding Brigham's testimony." *People v. Young*, 7 N.Y.3d at 44. The majority held that the trial court "might well have admitted Brigham's testimony", but its refusal to do so was within the bounds of its discretion. *Id.* In reaching that conclusion, the majority considered two factors: the extent to which the research findings discussed by Brigham were relevant to Mrs. Sykes' identification of Young; and the extent to which that identification was corroborated by other evidence. *Id.* According to the majority, "[t]he first of these factors favors the admission of the testimony–so much so that, if the identification were not strongly corroborated, the exclusion of Brigham's testimony would be hard to justify. But the corroboration was strong enough for the trial court reasonably to conclude that the expert's testimony would be of minor importance." 7 N.Y.3d at 44-45.

One judge dissented, holding that it was error, as a matter of law, to permit an independent source hearing for the prosecution's only identification witness prior to the second trial; and that it was also an abuse of discretion for the court to preclude the admission of expert psychological testimony by the defendant regarding the factors that affect the reliability of human perception. *People v. Young*, 7 N.Y.3d at 46 (Smith, J., dissenting).

### F. The Federal Habeas Petition

In his timely filed habeas petition (Docket No. 1), Young asserted the following three

grounds for relief: (1) the prosecution failed to establish by clear and convincing evidence that Mrs. Sykes' in-court identification had an independent basis other than the illegal line-up identification; (2) the trial court abused its discretion and violated Young's constitutional right under *Chambers v. Mississippi* to present a defense when it denied the defense request to call an expert social psychologist regarding the reliability of eyewitness identifications; and (3) his adjudication as a persistent felony offender violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Respondent answered the petition (Docket Nos. 11 & 12), asserting that none of the claims warranted habeas relief. In addition, respondent asserted the defense of non-exhaustion with regard to Young's claim concerning the trial court's refusal to admit expert testimony. Respondent argued that the constitutional claim was unexhausted because it had only been raised on direct appeal in terms of a violation of state evidentiary law.

Thereafter, Young moved to supplement his petition to add a claim that appellate counsel was ineffective in failing to assert that the defense expert was excluded in violation of Young's constitutional right to present a defense. Young also requested that the petition be stayed while he returned to state court to exhaust his ineffective assistance claim. Respondent opposed Young's request for a stay.

This Court granted Young's motion to stay and to supplement his petition. The Court deemed the amended petition to include the three claims asserted in the original petition as well as the new claim of ineffective assistance of appellate counsel. *See* Order Dated Feb. 3, 2009 (Docket No. 24).

Following the completion of his state court *coram nobis* proceeding, at which his

ineffective assistance of appellate counsel claim was denied, Young timely returned to District Court and moved to lift the stay. Respondent filed an answer (Docket No. 28) to the amended petition, but incorrectly noted that the amended petition only contained one claim (the ineffective assistance of appellate counsel claim). To the contrary, the Court expressly stated in its order granting the stay that the amended petition contained the three claims asserted in the original petition plus the ineffective assistance claim. *See* Docket No. 24. The Court has considered respondent's arguments asserted in the original answer (Docket Nos. 11 & 12) with regard to the original three habeas claims.

Young did not file a reply memorandum of law.

For the reasons that follow, the petition is granted in part and denied in part.

## III.    Applicable Legal Principles

### A.    Standard of Review

Federal habeas review is available for a State prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law are not subject to federal habeas review. *See*, *e.g.*, *Estelle v McGuire*, 502 U.S. 62, 67-68 (1991); *Cupp v Naughten*, 414 U.S. 141, 146 (1970).

Because Young's petition, filed in 2006, postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered titles of the U.S.C.), AEDPA's revisions of 28 U.S.C. § 2254 govern the proceeding. *Lurie v. Wittner*, 228 F.3d 113, 120-21 (2d Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000); *Lindh v. Murphy*, 521 U.S. 320, 322-23, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997); *Tankleff v. Senkowski*, 135 F.3d 235, 242

(2d Cir.1998)). The Second Circuit has summarized the requirements placed upon a habeas petitioner by the AEDPA standard as follows:

> Under AEDPA, to prevail on a petition for a writ of habeas corpus, a petitioner confined pursuant to a state court judgment must show that the court's "adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law" refers to holdings of the Supreme Court, as opposed to dicta, as of the time of relevant state court decisions. *Carey v. Musladin*, 549 U.S. 70, 74-75, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" occurs when a "state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* "Unreasonableness is determined by an 'objective' standard." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005) (quoting *Williams*, 529 U.S. at 409, 120 S.Ct. 1495).

*Friedman v. Rehal*, 618 F.3d 142, 152-153 (2d Cir. 2010) (Korman, D.J., sitting by designation)

The Supreme Court has stated that "unreasonableness" should not be conflated with "clear error" because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001). However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks

omitted).

"[A] 'state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir.2006) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001) (quotation and alteration marks omitted)). Where a claim has been "adjudicated on the merits," 28 U.S.C. § 2254(d), "deference [is] mandated under AEDPA," *Sellan*, 261 F.3d at 310, in the federal habeas court's review of petitioner's claim. All of Young's claims have been adjudicated on the merits by the state courts.

### B.     Exhaustion and Procedural Default

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. See 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir.1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "opportunity to pass upon and correct alleged violations of . . . [a] prisoner's federal rights." *Picard*, 404 U.S. at 275 (citation omitted).

The standards for presenting federal constitutional claims to state courts are not so stringent as to require the recitation of "book and verse on the federal constitution." *Picard*, 404 U.S. at 278 (citation omitted). However, the state courts must be "apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.'" *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir.1997) (quoting *Daye v. Attorney Gen's of N.Y.*, 696 F.2d 186, 191 (2d Cir.1982) (*en banc*)). Petitioners can ensure that state courts are "alerted to the fact that [they] are asserting claims under the United States Constitution," *Duncan v. Henry*, 513 U.S. 364, 365-66

(1995), by presenting their claims in a fashion demonstrating either (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *Daye*, 696 F.2d at 194; *accord Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir.1984). Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is generally fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994) (citation omitted).

## IV.   Analysis of the Petition

### A.   Ground One: Failure to establish independent source for in-court identification

Young argues that the state courts' adjudication of his claim concerning Mrs. Sykes' identification of him was contrary to, and an unreasonable application of, *United States v. Wade*, 388 U.S. at 220, because the prosecution did not establish by clear and convincing evidence that Mrs. Sykes had an independent source for her in-court identification of him, apart from her identification of him at a line-up, which was suppressed as being unattenuated from Petitioner's arrest without probable cause. Petitioner's Memorandum of Law, attached the Petition ("Pet'r Mem.") at 13 *et seq.* (Docket No. 1). Petitioner emphasizes that he is "arguing that his line-up was illegal, not suggestive, therefore, he is under the Wade standards and not the standard set forth in Neil v. Biggers, 409 U.S. 188 . . . ." *Id.* at 16.  In *United States v. Wade*, 388 U.S. 218 (1967),the Supreme Court held that a defendant has the right to counsel at all "critical stages" of

the criminal process. 388 U.S. at 226-7. A police line-up is one such critical stage. Therefore, identification testimony from a post-indictment, pre-trial line-up tainted by the denial of counsel was held to be inadmissible when there was no independent source shown. *Id.* at 240. In *Wade*, a direct appeal of a federal criminal conviction, the defendant had been denied his Sixth Amendment right to have counsel present at the line-up procedure. The Supreme Court declined to exclude the in-court identification as a matter of law but rather remanded the case for a determination as to whether, assuming the illegality of the line-up, the in-court identification was made possible "by [the] exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wade*, 388 U.S. at 241 (citing *Wong Sun v. United States*, 371 U.S. 471, 488; quotation omitted). The Supreme Court stated in *Wade* that application of that test in the identification context required consideration of "various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *Id.*

 The determination of whether an in-court identification has a source independent of an earlier "tainted" or illegal identification is a mixed question of law and fact. *See Wade*, 388 U.S. at 241-42; *accord, e.g.*, *Tomlin v. Myers*, 30 F.3d 1235, 1241 n.12 (9th Cir. 1994) ("Whether [the] identification was derived from an independent source is a mixed question of law and fact, as ' "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] . . . [constitutional] standard, or to put it another way,

whether the rule of law as applied to the established facts is or is not violated."'") (quoting

*Norris v. Risley*, 878 F.2d 1178, 1181 (9th Cir. 1989) (quoting *United States v. McConney*, 728

F.2d 1195, 1200 (9th Cir. 1984) (*en banc*) (alterations in *Norris*)). "On federal habeas review,

mixed questions of law and fact translate to 'mixed constitutional questions (i.e., application of

constitutional law to fact)[.]'" *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002) (quoting

*Williams v. Taylor*, 529 U.S. 362, 400 (2000) (O'Connor, J., concurring). Under AEDPA, such

questions "are subject to the standard set forth in 28 U.S.C. § 2254(d)(1), which requires the

habeas court to determine whether the state court's decision 'was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States.'" *Overton*, 295 F.3d at 277 (quoting 28 U.S.C. § 2254(d)(1)).

When a state appellate court affirms the denial of a claim without comment, this Court

must look to the last "reasoned" state court opinion to determine and presume the state appellate

court's reasoning." *Williams v. Goord*, 277 F. Supp.2d 309, 318 (S.D.N.Y. 2003) (citing *Ylst v.

Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("[W]here the last

reasoned opinion on the claim explicitly imposed a procedural default, we will presume that a

later decision rejecting the claim did not silently disregard that bar and consider the merits.");

*Hayes v. Coombe*, 142 F.3d 517, 519 (2d Cir. 1998)). In this case, the New York Court of

Appeals found that because there was factual "support"[3] in the record for the Appellate

Division's finding of an independent source, the issue was beyond its power to review, as it is

only authorized to review questions of law. This holding unreasonably misapprehends the nature

---

[3]        Interestingly, the Court of Appeals did not indicate the quantum of factual support found in the
record.

of the *Wade* inquiry, which is a mixed question of law and fact. Essentially, the New York Court

of Appeals did not decide the independent source issue, which forces this Court to "look

through" its opinion to the last reasoned state court opinion, i.e., the Appellate Division's

affirmance of the conviction. *See Ylst v. Nunnemaker*, 501 U.S. at 803. For the reasons that

follow, I conclude that the state court unreasonably applied *Wade* in finding that Mrs. Sykes' in-

court identification of Young had a source independent of the illegal, suppressed line-up

identification.

The first *Wade* factor is the eyewitness' prior opportunity to observe the alleged criminal

act. The victim testified that she had the opportunity to look directly at Petitioner for a period of

about five to seven minutes, in her estimation, in an area with good lighting. However, the

viewing was made under extremely stressful circumstances, including the intruder, wielding an

axe over the head of her wheelchair-bound husband, threatening, "I will kill him," if the Sykes

did not cooperate. Although Mrs. Sykes had several minutes to observe the intruder, he was

wearing a scarf that almost completely covered his face and head, and thus she could see only his

forehead, eyebrows, eyes and that part of his nose above the scarf. This factor clearly weighs

against the prosecution.

The Second *Wade* factor refers to the existence of any discrepancy between any

pre-lineup description and the defendant's actual description. It bears emphasizing that Mrs.

Sykes was essentially unable to give a pre-lineup description of the intruder. In the time-period

immediately after the crime, Mrs. Sykes was unable to assist the police in constructing a

composite of the intruder because she said she had not seen the full face of the intruder. She,

could have, however, described what she saw–his eyes, forehead, and eyebrows. However, she

conceded that there were no distinguishing characteristics with respect to the intruder's forehead, eyebrows, or eyes–the only parts of his face that were visible. In light of her admission that there was nothing even remotely remarkable about the parts of the intruder's face Mrs. Sykes' did see, the Court is dubious of her contention at trial that she allegedly had nightmares about "those eyes". The second *Wade* factor clearly favors Petitioner.

With regard to the third *Wade* factor, which asks whether the witness, prior to the suppressed lineup, made any identification of another person, Mrs. Sykes did not identify anyone else as the perpetrator, so the third factor is neutral. However, as discussed below, the fifth factor strongly favors Petitioner.

Turning to the fourth *Wade* factor, whether the eyewitness could make an the identification by picture of the defendant prior to the lineup, the Court notes that Mrs. Sykes was unable to select Young from a photo array one month after the crime. Despite carefully looking into the eyes of each man set forth in the photo array, Mrs. Sykes could not pick out Young's picture. This factor strongly disfavors the prosecution.

With regard to the fifth *Wade* factor–whether the eyewitness failed to identify the defendant on a prior occasion–Mrs. Sykes was unable to identify Young at a photo array conducted one month after the incident. Her record for reliability is thus quite poor. Closely related to the fourth factor in this case, the fifth factor weighs heavily in Petitioner's favor.

Finally, the sixth *Wade* factor is the lapse of time between the alleged act and the in-court identification. Although *Wade* refers to the time between the crime and the lineup identification, it does not make sense, in this case, to measure the duration with the lineup as the second point in time. This is because Mrs. Sykes says that she relied upon the intruder's voice, as well as his

face, in order to make the positive identification. As noted above, that lineup identification was suppressed. And, there is no indication in the record that Mrs. Sykes had the opportunity to have Young speak at trial before she made her in-court identification of him. There was a delay of over a year between the crime and Mrs. Syke's in-court identification of Young. The Supreme Court held in *Neil v. Biggers,* 409 U.S. 188, 201 (1972) that a delay of only seven months between the crime and the pre-trial identification procedure was a "seriously negative factor" weighing against independent reliability.

Reviewing the *Wade* factors, all of them are on Petitioner's side of the scale, and none of them are on the government's. The circumstances of the original viewing during the crime and the subsequent identification procedures overwhelmingly suggest that Mrs. Sykes' alleged independent "recollection" of Petitioner's face was irrevocably tainted by her having viewed defendant in the lineup and having heard him speak, with no independent basis whatsoever. It is evident that under totality of the circumstances, there was a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). In all likelihood, Mrs. Sykes' in-court identification stemmed from the suggestive courtroom setting in which Petitioner was obviously the accused. At best, the in-court identification relied on the suppressed, illegal pre-trial identification where Mrs. Sykes saw Petitioner *and* heard his voice, the latter of which is one of the factors that she admittedly relied upon in identifying him in the line-up. Given the facts as developed at the independent source hearing and at trial, it was an unreasonable application of clearly established Supreme Court precedent, *e.g.*, *Wade*, for the state court to conclude that the victim's in-court identification was independently reliable.

"A habeas petitioner is entitled to relief only if the constitutional error at trial was not

harmless." *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004). On habeas review, "[a]n error is not harmless if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Raheem v. Kelly*, 257 F.3d 122, 142 (2d Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted in *Raheem*)). "The principal factors to be considered in the determination of whether the erroneous admission of evidence was harmless are 'the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case.'" *Id.* (quoting *Wray v. Johnson*, 202 F.3d at 526).  In assessing importance of evidence introduced as the result of constitutional error, the reviewing court is to "consider questions such as 'whether the testimony bore on an issue that is plainly critical to the jury's decision, . . . whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, . . . and whether the wrongly admitted evidence was emphasized in arguments to the jury.'" *Id.* (quoting *Wray*, 202 F.3d at 526) (internal quotation marks omitted in *Raheem*; ellipses in *Raheem*). Here, without Mrs. Sykes' identification of Young, the prosecution essentially had no case. The identification testimony by Mrs. Sykes was absolutely critical to establishing the essential element of identification. There was no other identification testimony, since the second victim was unable to identify the intruder. Young did not make any inculpatory statements to the police. The identification evidence was not corroborated and was not cumulative. The only evidence linking him to the home invasion was circumstantial–several watches and a pair of binoculars belonging to Mr. Sykes which one of Young's acquaintances stated she obtained from him and then sold. Even assuming that this testimony was accurate, the source of Petitioner's possession of those items was unknown, and those items could have been acquired byPpetitioner in

circumstances other than the robbery. This evidence is clearly inadequate upon which to base a

conviction for robbery. Another acquaintance was found to have a pair of Mrs. Sykes' workout

gloves in her garbage, but she testified that she did not ever see Young with the gloves, and she

had many individuals coming through her home (which was a crack house) on a nightly basis.

The Court has grave doubts whether this circumstantial evidence was even legally sufficient to

convict Young under the very lenient *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), standard.

The prosecutor naturally relied heavily upon Mrs. Sykes' in-court identification, emphasizing the

sincere certainty of her testimony. Indeed, this Court holds that as a matter of law, there is

insufficient evidence upon which to convict Petitioner absent the identification testimony.

Given the relative weakness of the prosecution's case against Petitioner, the in-court

identifications and lineup evidence were crucial to the jury's verdict. Moreover, defense counsel

made misidentification the cornerstone of Petitioner's defense. On this record, there is no doubt

in the Court's mind that "the error influenced the jury's deliberations," *Brecht*, 507 U.S. at __,

113 S.Ct. at 1723 (Stevens, J., concurring), in a way that was "substantial and injurious," *Brecht*,

507 U.S. at ___, 113 S.Ct. at 1714. Accordingly, Young's conviction cannot stand. *See Raheem

v. Kelly*, 257 F.3d 122, 143 (2d Cir. 2001) (granting § 2254 petition where identification was not

independently reliable and error was not harmless under *Brecht*; noting in harmless error analysis

that the prosecution emphasized the erroneously admitted identification testimony during

summation and, as to the identity of the shooter, the prosecution had presented nothing else;

holding that "[t]he error in admitting that testimony cannot be termed harmless").

**B. Ground Two: Erroneous Exclusion of Expert Witness Testimony on Eyewitness Identifications**

In his petition, Young argues that "under <u>Daubert</u>,[4] it was an abuse of discretion as a matter of law for the trial court to deny the defense's request to call an expert witness as to eyewitness identification." Pet'r Mem. at 23 (Docket No. 1). Young also argues that the preclusion of Dr. Brigham's testimony on the reliability of eyewitness identifications "depriv[ed] Petitioner his right to call a crucial witness and present a 'misidentification' defense." *Id.* (Docket No. 1) (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)[5]).

## 1. The Exhaustion Requirement Has Not Been Fulfilled

Respondent argues that the claim is unexhausted because Young did not present this evidentiary claim to the state courts in terms of a violation of his constitutional right to present a defense. For purposes of exhaustion, "the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." *Daye*, 696 F.2d at 192 (citations omitted). "The chief purposes of the exhaustion doctrine would be frustrated if the

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that expert testimony is admissible under the Federal Rules of Evidence if it is based upon scientific knowledge and it will assist the trier of fact to understand or determine a fact in issue). Daubert involved the scope of the Federal Rules of Evidence, not the constitutional right to present a defense.

[5] "[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citation omitted). "[T]he erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense." *DePetris v. Kuykendall*, 239 F.3d 1056, 1062 (9th Cir.2001) (citing *Chambers v. Mississippi*, 410 U.S. at 294). In *Chambers*, Mississippi's "voucher" rule prevented a defendant from impeaching a witness who had previously confessed to the crime. The Supreme Court determined that the rule, "as applied in this case, plainly interfered with [the defendant's] right to defend against the State's charges." Chambers, 410 U.S. at 298. "The *Taylor-Chambers* case law has been applied to the exclusion of expert witnesses," and thus this right includes the right to present expert witnesses. *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir.2001) (citing *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000); *Ronson v. Commissioner of Correction*, 604 F.2d 176, 178-79 (2d Cir.1979) (*per curiam*)). *Chambers* does not stand for the proposition that a defendant's right to due process is violated any time that the trial court excludes favorable evidence. *United States v. Scheffer*, 523 U.S. 303, 316 (1998). A defendant does not have a boundless right to present testimony that is incompetent, privileged, or otherwise inadmissible. *Taylor v. Illinois*, 484 U.S. at 410

federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.*

In his appellate brief, appellate counsel cited only to New York State cases, as well as State cases from other jurisdictions. These cases did not employ any constitutional analyses, instead holding that the use of expert testimony regarding identification is a matter for the trial court's discretion, and that abuse of discretion may be erroneous as a matter of law. Pet'r App. Br. at 37 *et seq.* Appellate counsel cited some Federal district court and Circuit Court of Appeals cases, but they did not employ any constitutional analyses; rather, the cases dealt with whether a Federal trial court can discretionarily admit expert testimony and under what circumstances is the failure to admit the testimony an abuse of discretion. *Id.* at 40 *et seq.* Appellate counsel never mentioned any Supreme Court or other cases addressing the constitutional right to present a defense. Nor did appellate counsel's brief assert the claim in terms so particular to call to mind a specific right protected by the Constitution or allege a pattern of facts that is well within the mainstream of constitutional litigation. *See Daye*, 696 F.2d at 194. Thus, I agree with respondent that Young failed fairly present his constitutional claim to the state courts because his appellate brief did not alert the state courts that a Federal constitutional claim was at issue either by "citing chapter and verse of the Constitution" or by any of the alternative means set forth in *Daye*, 696 F.2d at 194. The claim, therefore, is unexhausted. *See Piscopo v. Michigan*, No. 2:07-CV-15398, 2010 WL 4942660, at *9 (E.D. Mich. Nov. 23, 2010) ("As noted, Petitioner's state court briefs addressing his third habeas claim contained only general allegations of a denial of due process. Indeed, even his habeas petition contains only oblique references to the inability to present a defense, focusing instead on the state evidentiary rules of expert witness qualification. This claim

[regarding the exclusion of expert testimony] is thus unexhausted..").

A Federal claim that is procedurally defaulted by state law "meets the technical requirements for exhaustion" because "there are no state remedies any longer 'available' to [the habeas petitioner]." *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *accord, e.g.*, *Grey v. Hoke*, 933 F.2d at 120. Under former New York Court of Appeals Rule 500.10(a), New York "permit[ted] only one application for direct review[.]" *Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (quoting N.Y. Ct. App. R. 500.10(a) (1999)). The rule has since been amended, and criminal leave applications are now addressed in N.Y. Court of Appeals Rule 500.20. *Colon v. Connell*, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009). While this section does not specifically state that there may be only one application for appeal, *see* N.Y. Ct. App. R. § 500.20, "such a restriction may be inferred." *Colon,* 2009 WL 2002036, at *6 n.4. First, N.Y. Court of Appeals Rule 500.20(d) and C.P.L. § 460.10(5) provide a 30-day window for any such application to be filed, and "this time limit would be meaningless were multiple applications permitted." *Colon*, 2009 WL 2002036, at *6 n.4. Second, N.Y. Court of Appeals Rule 500.20(d) provides that a request for reargument or reconsideration of an appeal may not raise any new points, implying that a wholly new request for leave to appeal would be impermissible. *Colon*, 2009 WL 2002036, at *6 n.4 (citing *Roa v. Portuondo*, No. 02 Civ. 6116, 2007 U.S. Dist. LEXIS 74387, at *32-33 (S.D.N.Y. Oct. 5, 2007) (declining to review issue that petitioner had failed to raise on direct appeal); *Murray v. Williams*, No. 05 Civ. 9438, 2007 WL 430419, at *8 (S.D.N.Y. Feb.8, 2007) (same); *Oquendo v. Senkowski*, 452 F. Supp.2d 359, 368 (S.D.N.Y.2006) (same)); *see also Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL

783538, at *14 & n.12 (S.D.N.Y. Mar. 26, 2008) (same), *report and recommendation adopted*, *Harden v. LaClaire*, 07CIV4592LTSJCF, 2008 WL 4735231 (S.D.N.Y. Oct. 27, 2008).

### 2. The Exclusion-of-Evidence Claim Must Be Deemed Exhausted and Procedurally Defaulted

Were Young to seek collateral review in state court of the exclusion-of-evidence claim by means of another C.P.L. § 440.10 motion to vacate the judgment, the motion court would be mandated to deny the claim pursuant to C.P.L. § 440.10(2)(c) (mandating dismissal of claim if it could have been raised on direct review but was not). *See Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record."). When the alleged evidentiary error is "particularly well-established in the trial record," *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003), the error is subject to mandatory dismissal under C.P.L. § 440.10(2)(c).

"For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989); other citations omitted); *see also Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000); *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994).

Such is the case here–Young's exclusion-of-evidence claim should be deemed exhausted. However, the same procedural bar that results in the "constructive exhaustion" of the claims also creates a procedural default and will prevent this Court from reaching the merits of the claims,

*e.g.*, *Grey v. Hoke*, 933 F.2d at 120-21, unless Young can "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,'" *i.e.*, a showing of "actual innocence." *Harris v. Reed*, 489 U.S. at 262, 109 S.Ct. at 1043 (citations omitted); *accord*, *Schlup v. Delo*, 513 U.S. 298, 324-27, 115 S.Ct. 851, 865-67 (1995); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116 (1997).

### 3. Ineffective Assistance of Appellate Counsel Cannot Serve as Cause for the Procedural Default

Although attorney ineffectiveness can amount to "cause", it must be true ineffectiveness–that is, ineffectiveness of a constitutional magnitude–not mere error. The ineffectiveness claim, in order to serve as cause, must also be fully exhausted. Here, Young could assert that his appellate counsel was ineffective for not presenting the claim regarding the exclusion of expert testimony in constitutional terms on direct appeal, and could argue that the omission of that argument should constitute "cause". Young has exhausted a claim of ineffective assistance of appellate counsel premised on such an omission. The state courts summarily dismissed the claim. The question is whether appellate counsel was constitutionally ineffective, which requires another question–whether the state courts unreasonably applied clearly established Supreme Court law in dismissing the *coram nobis* application. As discussed below in Section D, the Court reaches a contrary conclusion. Accordingly, appellate counsel's alleged ineffectiveness cannot constitute "cause" for the procedural default. Because the cause and prejudice test is conjunctive, the failure to make a showing on either prong is fatal to the defendant. In other words, a reviewing court need not determine whether there is both cause and

prejudice if the defendant's proof as to one element is lacking. Finally, Young has proffered no new, reliable evidence that was not presented to the jury that would demonstrate his factual innocence, and so he cannot avail himself of the miscarriage-of-justice exception.

Accordingly, Ground Two must be dismissed as procedurally defaulted.

### C. Ground Three: Unconstitutional Sentencing Under the Persistent Felony Offender Statute (Original Petition)

Young was sentenced under New York's "discretionary" persistent felony offender statute, N.Y. Penal Law § 70.10, which he asserts is unconstitutional under the Sixth Amendment, as explicated by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.

In April 2010, in a consolidated appeal of five § 2254 petitions, a panel of the Second Circuit concluded that New York's persistent felony offender sentencing scheme violated the Sixth Amendment, and that the New York courts unreasonably applied clearly established Supreme Court precedent in holding otherwise, but remanded the matters to the district court for consideration of whether those errors were harmless. *See Besser v. Walsh*, 601 F.3d 163, 189 (2d Cir.2010). A majority of judges in active service then called for the matter to be reheard *en banc*. In a 7-3 decision, the Second Circuit held several months later in *Portalatin v. Graham*, 624 F.3d 69, 73 (2d Cir. 2010), that the state courts did not engage in an unreasonable application of clearly established Supreme Court precedent in holding in, *e.g.*, *People v Rivera*, 5 N.Y.3d 61 (2005), *cert. denied*, 126 S.Ct. 564 (2005), that N.Y. Penal Law § 70.10 does not run afoul of the Sixth Amendment. *Portalatin*, 624 F.3d at 90-94. *Besser*, which had held otherwise, accordingly was vacated by *Portalatin*. Based upon the authority of *Portalatin v. Graham*, 624 F.3d 69,

Young's *Apprendi* claim attacking his sentencing as a persistent felony offender under N.Y. Penal Law § 70.10 must be denied.

### D. Ground Four: Ineffective Assistance of Appellate Counsel (Proposed Amended Petition)

Young asserts that appellate counsel erred in failing to present, in constitutional terms, a claim that the trial court's failure to allow him to call an expert witness at trial resulted in a denial of his constitutional right to present a defense. As noted above, a defendant has the fundamental constitutional right to present witnesses to support a defense against criminal charges under the Sixth and Fourteenth Amendments. *Chambers v. Mississippi*, 410 U.S. at 302; *see also Taylor v. Illinois*, 484 U.S. 400, 402 n. 1, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). That right is denied when the state "arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense." *Singleton v. Lefkowitz*, 583 F.2d 618, 623 (2d. Cir.1978) (citing *Washington v. Texas*, 388 U.S. 14, 23 (1967)), *cert. denied*, 440 U.S. 929 (1979)..

When Young raised this claim in his application for a writ of error *coram nobis* to the Appellate Division, that court summarily denied it without comment. The Appellate Division's holding constitutes an adjudication on the merits for AEDPA purposes. This Court's inquiry is whether the Appellate Division's summary ruling was contrary to, or an unreasonable application of, the clearly established Supreme Court precedent applicable to claims of ineffective assistance of appellate counsel–namely, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, it is used with respect to claims of ineffective appellate counsel.

*Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir.1992). Under AEDPA, a state habeas petitioner claiming ineffective assistance of appellate counsel must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002)

In examining the ineffectiveness of appellate counsel, the Supreme Court stated in *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the reviewing court must be mindful that there is no obligation on the part of appellate counsel to "raise every 'colorable' claim suggested by a client." *Id.* at 754. Furthermore, in examining a claim of ineffectiveness of appellate counsel, judges "are not 'to second-guess reasonable professional judgments' by appellate attorneys as to what are the most promising issues for appellate review." *Tsirizotakis v. LeFevre*, 736 F.2d 57 (2d Cir. 1984) (quoting *Jones v. Barnes*, 463 U.S. at 754).

Turning first to the "performance" prong, the Court does find it rather odd that appellate counsel did not include a "right to present a defense" claim along with the argument that the trial court abused its discretion in precluding Dr. Brigham's testimony. This is because another attorney from appellate counsel's office had referred, in passing, to the "right to present a defense" argument in drafting the C.P.L. 330.30 motion to set aside the verdict on the ground that the preclusion of Dr. Brigham's testimony was erroneous as a matter of law. For some reason, the "right to present a defense" argument was abandoned on direct appeal. The Court cannot say that it was necessarily stronger than the "abuse of discretion" argument that was raised; but the two certainly were complementary, and there does not appear to have been a significant downside to raising both.

However, in the final analysis, Young's ineffective assistance claim falters because he

cannot demonstrate that he was prejudiced by appellate counsel's omission. The New York Court of Appeals closely considered appellate counsel's argument that the trial court abused its discretion in precluding Dr. Brigham's testimony.

"'[W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the "omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" In a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (quoting *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996) (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). *Chambers* errors are subject to harmless error review. *E.g.*, *Fry v. Pliler*, 551 U.S. 112, 115, 116 (2007).

New York Courts have stated that the fundamental right of an accused to present witnesses in his own defense "embraces the right of a defense witnesses to present relevant and admissible testimony, which, if believed, could give rise to a reasonable doubt of the defendant's guilt." *People v. Husband*, 135 A.D.2d 406, 411 (App. Div. 3d Dept. 1997). Thus, had appellate counsel asserted a *Chambers* error, the New York Court of Appeals would have asked whether Dr. Brigham's testimony "if believed, could [have] given rise to a reasonable doubt," *People v. Husband*, 135 A.D.2d at 411, as to Young's identity as the robber. *See also Chambers*, 410 U.S. at 302 (" We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.").

Here, the New York Court of Appeals did evaluate the importance of Dr. Brigham's

testimony when it considered whether the trial court had abused its discretion in refusing to admit it. The Court of Appeals concluded that "Brigham's testimony could have been valuable to a juror in this case in assessing Mrs. Sykes's testimony." *People v. Young*, 7 N.Y.3d at 45. However, that court found, "the corroborating evidence, . . ., significantly diminishe[d] the importance of the proffered expert testimony . . . ." *Id.* at 46. The Court of Appeals pointed out that stolen property was found in possession of two of Young's acquaintances (Kimbrel and Isaac); neither of them could have been the robber, since both were women; and one of them pointed to Young as the person from whom she got the property. *Id.* The Court of Appeals concluded that "the corroboration was strong enough for the trial court reasonably to conclude that the expert's testimony would be of minor importance," *id.* at 45, and "would be an unnecessary distraction for the jury," *id.* at 46. In light of these conclusions by the New York Court of Appeals concerning the relative unimportance of Dr. Brigham's expert testimony given the particular circumstances of Young's case, it would have been virtually a certainty that the court would not have agreed that Dr. Brigham's testimony "could [have] give[n] rise to a reasonable doubt of the defendant's guilt[,]" *People v. Husband*, 135 A.D.2d at 411. Thus, Young cannot demonstrate that there is a reasonable probability that, but for counsel's unprofessional error in failing to present a *Chambers* argument, the New York Court of Appeals would have reversed his conviction. Accordingly, the Appellate Division's rejection of the ineffective assistance claim in Young's application for writ of error *coram nobis* was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent as set forth in *Strickland*, 466 U.S. at 687-89. Therefore, habeas relief is denied as to Ground Four.

**V.     Remedy**

"Federal courts have broad discretion in fashioning a remedy for unlawful incarceration."
*Garcia v. Portuondo*, 459 F. Supp.2d 267, 293 (S.D.N.Y. 2006) (citing *Hilton v. Braunskill*, 481
U.S. 770, 775 (1987). Title 28, Section 2243 authorizes Federal courts to "dispose of [a habeas
petition] as law and justice require." 28 U.S.C. § 2243.

"This authority gives a district court discretion 'to preclude a state from retrying a
successful habeas petitioner when the court deems that remedy appropriate.'" *Morales v.
Portuondo*, 165 F. Supp.2d 601, 609 (S.D.N.Y. 2001) (Chin, D.J.) (granting writ of habeas
corpus unconditionally and barring state from retrying petitioner) (quoting *Foster v. Lockhart*, 9
F.3d 722, 727 (8th Cir.1993) and citing *Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir.1993)
("barring a new trial [following the grant of a habeas petition] is a permissible form of
judgment"); *Burkett v. Cunningham*, 826 F.2d 1208, 1226 (3d Cir.1987) (unconditional release
ordered where "no relief short of discharge could fully remedy [constitutional] violations").

As courts have observed, the typical relief granted in federal habeas corpus is a
conditional order of release, directing that the prisoner be released from custody unless the state
acts to legalize custody, for example, by initiating a new trial free from constitutional defect,
within a reasonable period of time. *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 403, 113 S.Ct.
853, 122 L.Ed.2d 203 (1993); *Leka v. Portuondo*, 257 F.3d 89, 107 (2d Cir.2001); *Boyette v.
Lefevre*, 246 F.3d 76, 93 (2d Cir.2001); *Lindstadt v. Keane*, 239 F.3d 191, 206 (2d Cir.2001).
Here, unconditional, immediate release does not appear to be possible, because Young is serving
concurrent prison terms on the basis of other, unchallenged convictions as well, and these
sentences have not expired.

The Court has considered the option of permitting the prosecution to retry Young, but it

concludes that on the present record, there cannot be a trial free from constitutional defect. This is because, without the inadmissible in-court identification of Mrs. Sykes,  the prosecution would not be able to secure a conviction based upon legally sufficient evidence so as to satisfy due process concerns, as the Court explained above. In other words, the Court finds that no reasonable jury could convict Young without the identification testimony of Mrs. Sykes.

Therefore, the Court is convinced that the circumstances of this case warrant the extraordinary remedy of precluding the prosecution from retrying Young on the charges stemming from the Sykes home invasion.

The Monroe County District Attorney's Office is hereby barred from re-trying Young for the charges brought in connection with the Sykes home invasion which were the basis for the instant habeas petition. These convictions are vacated and the Monroe County District Attorney's Office is ordered to take whatever steps are necessary to restore Young to the status he was in prior to his arrest and prosecution in the underlying home invasion case. These steps shall include expungement of the convictions and all references to them in the public record.

## VI.    Conclusion

For the reasons set forth above, the amended petition for a writ of habeas  corpus filed by Rudolph Young is **granted** as to his claim that the victim's identification was admitted in violation of his constitutional rights. The amended petition is denied in all other respects and no certificate of appealability is granted as to the remaining claims, as he has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* FED. R.APP. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir.2000).

It is hereby ordered that Young's convictions of offenses in connection with the Sykes home invasion be vacated. Because Mrs. Sykes shall not be permitted to make an in-court identification, and because the Monroe County District Attorney's Office is hereby barred from utilizing Mrs. Sykes' identification of Young as the perpetrator in a retrial, the remaining proof does not provide a legally sufficient basis for conviction as a matter of law. The Court notes that Young is serving a term of 25 years to life on a fourth degree criminal possession of stolen property conviction, which was imposed in 1994 and which runs consecutively to the convictions stemming from the Sykes home invasion. The sentence for the stolen property conviction has not expired and is no longer open to collateral attack. Therefore, the judgment in this case does not require his release.

This judgment is stayed pending completion of appellate proceedings, if any.

The Court further determines that counsel from the Criminal Justice Act Panel should be appointed to represent Young in connection with further proceedings in this matter. An order appointing a specific attorney from the CJA Panel shall follow.

**ALL OF THE ABOVE IS SO ORDERED.**

/s/ Victor E. Bianchini
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:       January 27, 2011
             Rochester, New York